## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRACEY LYNNE CONN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-791-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

David J. Lyons, Esquire of Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, District of Delaware, and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, District of Delaware. Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Maija DiDomenico, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: March 30, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Tracey Lynne Conn ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (D.I. 7 at 14) Plaintiff has filed a motion for summary judgment asking the court to remand the case for further proceedings. (D.I. 9) Defendant has filed a cross-motion for summary judgment, requesting the court affirm his decision and enter judgment in his favor. (D.I. 12) The court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. BACKGROUND

### A. Procedural History

Plaintiff filed for DIB and SSI on November 3, 2005 alleging that she had been disabled since January 19, 2004. (D.I. 7 at 102; 109) Plaintiff's claims were initially denied on July 12, 2006 and denied upon reconsideration on November 9, 2006. (*Id.* at 67-77) Plaintiff timely filed for and was granted a hearing on the matter. On November 8, 2007, a hearing on plaintiff's claims was held in front of Administrative Law Judge ("ALJ") Edward J. Banas. (*Id.* at 26) In a decision issued January 5, 2008, the ALJ found that plaintiff was not disabled because, while she could not perform her past work, she could perform other work available in the national economy. (*Id.* at 24-25) The Appeals Council denied plaintiff's request for review and, therefore, the ALJ's decision became defendant's final decision. (*Id.* at 1) Having exhausted her

administrative remedies, plaintiff filed a civil action in this court on September 17, 2010, seeking review of defendant's decision to deny her DIB and SSI.

## B. Plaintiff's Non-Medical History

Plaintiff was born on September 23, 1966 which made her 37 years old on her alleged disability onset date. (*Id.* at 33) Plaintiff is a high school graduate who has previously worked as an admissions coordinator, general office worker and stock room worker. (*Id.* at 33; 166-71)

## C. Plaintiff's Medical History[1]

While plaintiff claims to have suffered from back pain since 1991, it appears a slip and fall on a patch of ice precipitated her current medical condition and this disability claim.[2] (*Id.* at 33; 310)

### 1. Chiropractic care

The administrative record contains billing records from the Baer Chiropractic Center. (*Id.* at 250-72) From these records, it appears that plaintiff treated with a Dr. Alexander Bohatiuk (Dr. A. Bohatiuk) at Baer Chiropractic from September of 2002 until February of 2003 and then resumed treatment in 2004 after her fall. (*Id.* at 251-58)

---

[1] Because the only medical evidence directly at issue on this appeal relates to plaintiff's complaints of degenerative disc disease, the background presented in this section will be limited to that alleged impairment.

[2] At times, plaintiff's testimony and the record clearly suggest that her slip and fall precipitated this disability claim. (*e.g.* D.I. 7 at 33; D.I. 13 at 3) However, plaintiff also testified that she stopped working in the summer of 2005 (after a brief stint as a receptionist) because she could no longer do the type of work she was doing; in other words, it was not the fall that specifically prompted this claim, but instead degenerative changes that had been building since 1991. (*Id.* at 42; 49)

After the fall, Dr. A. Bohatiuk wrote a series of prescription pad notes stating that plaintiff could not work due to a low back injury. (*Id.* at 267-71) At Dr. A. Bohatiuk's request, plaintiff had an MRI of the lumbar spine done on March 26, 2004. (*Id.* at 295) That MRI revealed: "Dessication of disc material . . . at all levels except L2-3" as well as "a mild disc bulge at L5-S1 vs. a broadbased mild disc protrusion. Indentation on the thecal sac [was] minimal, if any." (*Id.*) Treatment with Dr. A. Bohatiuk appears to have ceased in July of 2004. (*Id.*)

## 2. Physiatric care

On February 19, 2004, approximately one month after her fall, plaintiff visited with Dr. George M. Bohatiuk ("Dr. G. Bohatiuk"), a board certified doctor in physical medicine and rehabilitation. (*Id.* at 241) Notes from her first visit - a comprehensive physiatric evaluation - do not reference plaintiff's fall, but instead explain that plaintiff developed radiating low back pain after a 2-day sickness. (*Id.*) Dr. G. Bohatiuk's treatment notes indicate that plaintiff had "no tenderness, guarding, or trigger pointing" in the cervical, thoracic or lumbosacral sections of the spine; they also indicated "full painless cervical range of motion in all directions" and "[n]egative Kemp's and Fabere's tests." (*Id.*)

On a February 23, 2004 follow-up visit, plaintiff continued to complain of radiating neck and lower back pain. (*Id.* at 239-40) On physical examination, Dr. G. Bohatiuk noted "[t]enderness over the mid-low dorsal cervical paraspinal muscles" as well as "the low lumbar/lumbosacral paraspinal muscles" but a "negative Spurling's test," "a negative foramen compression test," "full painless cervical range of motion in all directions," and "no tenderness or guarding over the mid-thoracic paraspinal muscles." (*Id.*) An EMG

3

was also "directed to the C5-T1 paraspinal muscles and both upper extremities to assess for radiculopathy vs. brachial plexopathy vs. neuropathy." (*Id.*) Dr. G. Bohatiuk concluded that plaintiff had a "[c]ervical sprain/strain with radiculitis," "[c]ervical discogenic pain with radicular irritation," a "[t]horacic sprain/strain," and "[l]umbosacral sprain/strain with radiculitis, R/O radiculopathy" and recommended trigger point injections. (*Id.*) After receiving a series of trigger point injections in February and March, plaintiff followed up with Dr. G. Bohatiuk. (*Id.* at 234-37) Plaintiff reported considerable improvement with respect to her spinal pain complaints, but some lingering low back pain; "[t]enderness over her low lumbar/lumbosacral paraspinal muscles" was also noted. (*Id.*)

### 3. Primary care

Plaintiff's primary care physician was Dr. Ralph Burdick ("Dr. Burdick"). Treatment notes from after the fall indicate that plaintiff made sporadic complaints about back pain and was prescribed medication to manage the pain. (*Id.* at 290-91; 294) In May of 2005, Dr. Burdick requested an MRI of plaintiff's cervical and thoracic spines. (*Id.* at 294) Results revealed "mild degenerative changes present in the thoracic spine," as well as "degenerative changes present in the mid cervical spine" with findings "most pronounced with encroachment on the right neural foramina at C4-5 and C5-6." (*Id.* at 292) Dr. Burdick also requested spinal MRIs be done in April of 2008 and August of 2009. The 2008 MRI indicated: "Moderate cervical spondylitic changes which may have slightly progressed from the C4-C5 to C6-C7 levels without resulting in significant central canal or neural foraminal stenosis at either of the levels." (*Id.* at 343) The 2009 MRI revealed the following: "1) There is disc dessication with angular bulge seen about

4

L1-L2, L3-L4 and L4-L5, without frank herniation or stenosis. 2) At L5-S1, there is degenerative disc disease with slight retrolisthesis, annular bulge and superimposed central disc herniation, as well as bilateral facet arthropathy. There is mild narrowing of the lateral recesses and inferior borders of the foramina." (*Id.* at 345)

During the course of plaintiff's treatment, Dr. Burdick opined several times that plaintiff was not capable of working. On September 5, 2006, Dr. Burdick wrote out a prescription pad note that said plaintiff was "unable to work" due to "chronic neck and back pain." (*Id.* at 287) In December of 2006, Dr. Burdick filled out a Medical Impairment Evaluation in which he stated that plaintiff's chronic back and neck pain was "disabling." (*Id.* at 311) In November of 2007, Dr. Burdick wrote a "to whom it may concern letter" explaining that plaintiff "has been unable to work since August 5, 2005 due to chronic neck and back pain beginning in 1991." (*Id.* at 310)

### 4. Neurological care

On a referral from Dr. Burdick, Dr. Yakov Koyfman ("Dr. Koyfman"), of the Delaware Neurosurgical Group, saw plaintiff on June 30, 2005. (*Id.* at 244-45) She presented with complaints of neck and back pain and stated that her symptoms began around fifteen years before (although she did not mention any precipitating event). (*Id.*) After reviewing her medical history and performing a physical examination, Dr. Koyfman concluded that plaintiff was "in no acute distress" and surgical intervention was not recommended. (*Id.*) Dr. Koyfman did, however, diagnosis plaintiff with "[d]egenerative cervical, thoracic and lumbar spine disease" and referred her to James Downing for pain management and possible facet blocks. (*Id.*)

Dr. James Downing ("Dr. Downing"), of Interventional Spine Pain Consultants,

performed cervical facet injections on plaintiff in July of 2005; plaintiff did not find them to be helpful. (*Id.* at 248) Dr. Downing recommended that plaintiff "continue[] with conservative care including chiropractic care as tolerated." (*Id.*)

### 5. Consultative examination

On June 7, 2006, plaintiff met with Dr. Donald Archer, Jr. ("Dr. Archer") for a state agency consultative examination. (*Id.* at 273-74) She reported pain in her neck and back going back to 1991. (*Id.*) She also explained that she can dress and bathe herself and walk without an assistive device, although she reported fatigue in her limbs and a need to return to bed often to cope with pain. (*Id.*) After his examination, Dr. Archer concluded that plaintiff is "limited by chronic pain. . . . Her exam was significant for a decreased range of motion and it is likely related to some mild degenerative changes as well as . . . guarding due to pain." (*Id.*)

### 6. State agency opinions

In July of 2006, state agency physician R. Palandijan ("Dr. Palandijan") reviewed plaintiff's medical records to assess her residual functional capacity ("RFC"). (*Id.* at 281) Dr. Palandijan concluded that plaintiff's complaints are "disproportionate" to the medical evidence of record and that plaintiff should be able to sustain "light" work activity. (*Id.* at 286) Dr. Michael Borek affirmed this RFC in November of 2006. (*Id.* at 307-09)

### D. Hearing Before The ALJ

#### 1. Plaintiff's testimony

Plaintiff testified that she worked consistently until January 19, 2004 when she

6

injured her neck and back after slipping and falling on a patch of ice.[3]  (*Id.* at 33-34; 43-44)  She acknowledged trying to go back to work in 2005 for financial reasons.  (*Id.*)  According to plaintiff, between May and July of 2005, she did reception work for a chiropractor but had to quit due to neck and back pain; she explained that she "couldn't do the computer, the looking up and down work, getting up and down out of the chair to take the patients back."  (*Id.* at 34)

When asked to rate her pain from one to ten with ten requiring a trip to the hospital, plaintiff said she had a high pain tolerance but was an eight on good days.  (*Id.*)  She also told the ALJ that her pain was constant, effecting her all day and night even though she took Percocet four times a day to control her symptoms.  (*Id.*)  A burning sensation in her neck and back occurred alongside the pain.  (*Id.*)  She also noted that the day of her hearing was not a good day.  (*Id.*)  When asked whether or not she received any degree of relief from the spinal injections, she said she had about a day's worth of relief.  (*Id.* at 47)

When questioned about her daily routine, plaintiff said that she gets up in the morning, dresses herself and gets her son to the bus stop, but then heads back to bed or gets into her recliner and watches TV.  (*Id.* at 35-36)  After some more specific questioning, plaintiff stated that she can feed and dress herself, but her live-in boyfriend does most of the cooking, cleaning and household chores.  (*Id.* at 35-36; 44)  She also acknowledged driving a short distance one time a week to pick up her son from school and being able to stand or sit for one half hour at a time.  (*Id.* at 36; 45-46)

---

[3] As discussed *supra*, note 2, she also asserted that the fall was not the specific impetus for her claim.

7

Plaintiff complained of drowsiness being a side effect of her medications.[4] (*Id.* at 37-38) She stated that when she tried to go back to work in 2005, she needed to go off the medications because she could not effectively function while on them. (*Id.* at 41) When asked if she could work five hours a day in a sedentary position, she said that would not be possible due to her pain and the medication side effects. (*Id.* at 44) She also said that she could not sit for that period of time without needing to get up and stretch. (*Id.* at 45-46)

When asked if she and her boyfriend do any social activities, the answer was no. (*Id.* at 45)

### 2. Testimony of Georgiana Williams

Plaintiff's best friend, Georgiana Williams, testified on her behalf. (*Id.* at 51) She indicated that plaintiff could do more physical activities prior to her 2004 fall. Specifically, she explained that she has had to help plaintiff with things like her laundry and grocery shopping, and the two of them do not go out and enjoy themselves like they used to do. (*Id.* at 53-55) Ms. Williams did note that plaintiff drove the hour to the hearing, but she said she saw it take a toll on plaintiff physically. (*Id.* at 56)

### 3. VE's testimony

At the hearing, the ALJ asked Jan Reed, a vocational expert ("VE"), three hypothetical questions. First, he asked whether a hypothetical individual would be capable of any jobs in the national economy if this hypothetical person was "a younger

---

[4] Along with Percocet, she was also taking Valium for anxiety and Soma to relax her muscles. (*Id.* at 37) She also complained of migraine headaches - occurring at least four times a week and taking Toradol and Ibuprofen for those symptoms.

8

individual with a high school education and prior work history similar to that of [plaintiff] and if this hypothetical individual has all of the symptoms and limits that [plaintiff] stated [at her hearing]." (*Id.* at 59) In response, the VE said no, she would not, given the amount of pain she says she has and the time she says she needs to lay down in a given day. (*Id.*) After hearing that response, the ALJ asked two follow up questions.

First, he asked:

> Now, if I changed the hypothetical, this hypothetical individual might be capable of performing work activity at the sedentary level of exertion as defined in the Dictionary of Occupational Titles with the following provisos. Any job would have to entail a sit/stand option and also would not involve any complex tasks[,] it just entails simple, routine work. With those limits[,] any jobs?

(*Id.*) In response, the VE said that plaintiff could find jobs in the local and national economies, including a sedentary security guard, order clerk and assembler. (*Id.* at 59-60) Second, the ALJ asked:

> Now, what if I changed that hypothetical again, keeping the vocational factors the same as far as age, education, prior work. This hypothetical individual might be capable of doing work activity at the light level of exertion defined in the Dictionary of Occupational Titles. Any jobs that would have to entail a sit/stand option would give the person an opportunity to occasionally change positions for unusual postural discomfort. Also the jobs would have to be just simple, routine in nature. And also the jobs should not entail continuous use of the upper extremities, frequent use would be all right but not continually using upper extremities without any opportunity to rest. Any jobs you can think of that might fit into that[?]

(*Id.* at 60) In response, the VE explained that an inspector and mail clerk are jobs in the local and national economy that meet those requirements. (*Id.*)

On questioning from plaintiff's counsel, the VE acknowledged that the Dictionary of Occupational Titles ("DOT") does not address the sit/stand option. (*Id.* at 61) She also admitted side effects of medication like drowsiness resulting in a fifteen percent

9

decrease in productivity would eliminate all potential jobs for plaintiff. (*Id.* at 63)

## F. Regulatory Framework

The Social Security Administration is authorized to pay DIB and SSI to persons who are "under a disability." 42 U.S.C. § 423(a)(1)(E); 42 U.S.C. § 1382(c). Social Security Administration regulations incorporate a five-step sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). The ALJ first considers whether the claimant is currently engaged in substantial gainful activity.[5] If she is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the claimant's impairment meets the criteria of an impairment found in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999). If the claimant's impairment or combination of impairments meets or equals an impairment set forth in the listing of impairments, the claimant is disabled. If the impairment does not meet the criteria for a listed impairment, then the ALJ must first determine the claimant's residual functional capacity ("RFC") before moving on to the fourth and fifth steps of the evaluation process. RFC is defined as the most physical and mental work activity an individual can perform despite limitations resulting from his impairments. 20 C.F.R. § 404.1545. At step four, the ALJ assesses whether, despite

---

[5] Substantial gainful activity is work activity that is both substantial and gainful. 20 C.F.R. § 404.1572. Work is substantial when it involves doing "significant physical or mental activities." *Id.* Work is gainful when done for pay or profit. *Id.*

10

the existence of the severe impairment, the claimant has the RFC to perform his past work. Assuming she can, she is not disabled. If, however, the ALJ determines that the claimant cannot perform her past work, then, at step five, the ALJ must determine whether there is other work in the national economy that the claimant can perform. If the claimant can perform other work, she is not disabled; if he cannot perform other work, he will be found disabled.

## G. The ALJ's Decision

The ALJ ultimately concluded that plaintiff could perform other work in the

national economy and, therefore, was not disabled. The ALJ made the following

enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since January 19, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairment: degenerative disc disease of the lumbar and cervical spine (20 CFR 404.1520(c) 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that [plaintiff] has the residual functional capacity to perform simple, routine, light work with a sit/stand option except that she would require work that does not involve continuous use of the upper extremities.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 22, 1966 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date

11

(20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 19, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 7 at 16-25)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of

12

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v.*

13

*Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

Plaintiff's summary judgment motion identifies three reasons why she believes the unfavorable decision is not based on substantial evidence and, therefore, should be remanded. First, plaintiff argues that the ALJ failed to give proper weight to the opinion of plaintiff's treating physician Dr. Burdick.[6] Second, plaintiff argues that the ALJ improperly discounted plaintiff's subjective complaints of pain and drowsiness. Lastly, plaintiff contends that the ALJ improperly ignored testimony from the VE.[7]

### A. Treating Physician Opinion

Plaintiff correctly points out that deference is provided to the opinions of treating physicians. In fact, a treating source's medical opinion will be given "controlling weight" if an ALJ finds: 1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; and 2) the opinion is not inconsistent with the other substantial evidence in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(d)(2); Social Security Regulation ("SSR") 96–2p. In many cases, even if a treating source's medical opinion does not meet the test for controlling weight, it will nevertheless be entitled to great weight and should be adopted by an ALJ. *Id.* In order to determine what weight to accord a non-controlling treating physician's

---

[6] It was difficult to determine what exactly plaintiff was arguing in Argument Section I.A. of her brief. While the heading is titled "The ALJ incorrectly concluded that the Plaintiff had [an RFC] for [Light] Work," in substance, this section of the brief appears to focus on the issue of whether proper weight was accorded to the opinion of Dr. Burdick. (D.I. 10 at 9-12) Accordingly, the court will analyze it as such.

[7] These last two arguments are troubling given their sheer brevity and the total absence of citations.

opinion, an ALJ is required to weigh the evidence in light of several factors. *Id.* These factors include: 1) the examining relationship - more weight is given to the opinion of a source that has examined a plaintiff as compared to a source that has not; 2) the length, nature and extent of the treatment relationship - more weight is given to the opinion of treating sources since these professionals are most able to provide a detailed and longitudinal picture of a plaintiff's medical history; 3) the supportability of the opinion - more weight is given the opinions that are well explained and supported with clinical or diagnostic findings; 4) the consistency of the opinion - more weight is given to opinions that are more consistent with the record as a whole; 5) specialization - opinions of specialists are given more weight; and 6) other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d). Regardless of the weight accorded, an ALJ's determination must always provide "good reasons" for the weight given to a treating source's opinion, *id.*, and an ALJ can only "reject a treating physician's opinion if it is based on 'contradictory medical evidence.'" *Dougherty v. Astrue*, 715 F. Supp. 2d 572, 581 (D. Del. 2010) (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).

Some treating source opinions, including opinions of "disability" or an "inability to work," are not controlling or even considered medical opinions. 20 C.F.R. § 404.1527(e). This is because such opinions are administrative findings on issues reserved for defendant. *Id.* Therefore, to the extent that plaintiff argues that she deserves benefits based upon Dr. Burdick's determinations that she was "disabled" and "unable to work," that argument fails since those determinations are administrative decisions explicitly reserved for defendant.

To the extent that plaintiff argues that Dr. Burdick's opinions should have been

given controlling or more substantial weight, the court concludes that substantial evidence exists in support of the ALJ's decision to reject Dr. Burdick's findings and conclude that plaintiff was capable of a modified light RFC. The record, and the ALJ's decision, reflect that Dr. Burdick's conclusions were inconsistent with the medical evidence on the whole. Plaintiff's course of treatment was generally conservative. Plaintiff never visited an emergency room or had surgery; her pain was conservatively managed with medication and occasional chiropractic care or injections. Moreover, plaintiff's clinical findings were largely unremarkable. Dr. G. Bohatiuk initially noted no spinal tenderness, guarding or trigger points and recorded negative Kemp and Fabere tests; on a follow-up visit he diagnosed plaintiff with a sprain/strain and noted negative Spurling and foramen compression tests. Dr. Koyfman did not recommend surgical intervention. Dr. Downing recommended continued "conservative care." Plaintiff's MRIs revealed only mild degenerative conditions. Dr. Palandijan opined that light work would be appropriate and Dr. Borek agreed with this opinion. Furthermore, plaintiff only sporadically complained of back pain to Dr. Burdick and none of his treatment notes suggested that she has work-related functional limitations. For these reasons, Dr. Burdick's conclusions were also not well supported. As defendant explains, Dr. Burdick's own treatment notes "fail[] to support his extreme opinion." (D.I. 13 at 14) With respect to specialization, it should be noted, as the ALJ did, that Dr. Burdick is a generalist and does not have specialized training in occupational health or disorders of the spine.

Ultimately, the ALJ concluded that Dr. Palandijan's RFC findings corresponded with the medical evidence of record, whereas Dr. Burdick's conclusions were generally

16

inconsistent and unsupported. (D.I. 7 at 23) Substantial evidence supports the ALJ's position.

## B. Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ improperly discounted her subjective complaints of pain and medication-induced drowsiness. (D.I. 10 at 12-13) According to plaintiff, the record - in particular the opinions of Dr. Burdick and testimony of Georgian Williams - confirms that her complaints were credible. (Id.)

20 C.F.R. § 404.1529 and SSR 96-7p (which provides interpretive guidance on 20 C.F.R. § 404.1529) direct ALJs with respect to their evaluations of a claimant's alleged symptoms (particularly pain) and credibility determinations that must be made with respect these allegations.[8] The regulations explain that an ALJ must undertake a two-step process in evaluating subjective complaints. SSR 96-7p at *2. First, the ALJ must determine whether there is an impairment that could reasonably be expected to produce the pain or other symptoms. Id. Second, after making this determination, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. When subjective complaints unsubstantiated by objective

---

[8] SSR 96-7p opens by noting that its purpose is to "clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 . . . requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision." SSR 96-7p at *1.

17

medical evidence are at issue, the ALJ's evaluation requires a finding as to the claimant's credibility. *Id.* The regulations require that credibility determinations be made based upon a review of the entire record. *Id.* at \*2-3. Aside from objective medical evidence, the ALJ should consider the follow factors:[9] (1) daily activities; (2) location, duration, frequency and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) effectiveness of medications used in treating pain; (5) treatments other than medications that alleviate pain; (6) any other non-treatment measures that help alleviate pain (such as lying down); and (7) any other factors that relate to the pain at issue. *Id.* at \*3. Consistency in statements is another "strong indication" of credibility that should be considered. *Id.* at \*5. Importantly, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at \*4. This degree of specificity "is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned . . . decision." *Id.*

The ALJ's decision acknowledges that plaintiff's condition could cause her to suffer the symptoms that she alleged, but notes that the pivotal question is whether plaintiff's symptoms occur with such frequency, duration and severity as to preclude work activity on a continuing and regular basis. (D.I. 7 at 20-21) In other words, the

---

[9] "In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," these factors are also considered. SSR 96-7p at \*3.

ALJ acknowledges that he is required to make a credibility determination on plaintiff's complaints of debilitating back pain and drowsiness. (*Id.*) According to the ALJ, plaintiff's complaints "concerning the pain associated with her degenerative disc disease and her ability to work [were] not entirely credible" for several reasons. In this regard, the ALJ noted that no objective evidence (i.e., imaging studies and physical examinations) supported plaintiff's complaints with respect to the alleged severity of her pain. (*Id.* at 21-22) The ALJ also found that plaintiff's activities undermined her complaints of pain. (*Id.*) For instance, the ALJ noted that plaintiff was able to drive an hour to the hearing despite claiming she could not sit for more than one half hour at a time. (*Id.*) The ALJ also emphasized that plaintiff's demeanor did not reveal any sign of "discomfort" or "impairment" despite her earlier acknowledgment that she was in a great deal of pain. (*Id.*) The ALJ also discredited plaintiff's complaints of pain due to the fact that she had been working consistently since 1991 despite claiming to have back pain since that time. (*Id.*) Finally, the ALJ noted that the testimony of Ms. Williams, plaintiff's "best friend," was obviously biased and, therefore, could be discounted. (*Id.*)

The court has already acknowledged plaintiff's treating physicians, aside from Dr. Burdick, only found mild degenerative concerns; the other evidence highlighted by the ALJ further undermines plaintiff's credibility and reveals obvious inconsistences in her testimony. Accordingly, the court finds the ALJ's credibility determination to be based upon substantial evidence. The court also believes it to be of a sufficient specificity.

## C. VE Testimony

Plaintiff argues that the ALJ ignored two aspects of the VE's testimony: 1) that a claimant with the symptomology described by plaintiff (i.e., one with debilitating back

19

pain and medication-related drowsiness) would not be capable of work; and 2) that the DOT does not address the sit/stand option.

Contrary to plaintiff's position, the ALJ did not ignore the VE's answer to the hypothetical question posed about a claimant who suffered all the ailments described by plaintiff. Instead, the ALJ made a credibility determination and found that plaintiff's symptoms were not as severe as she described them to be. *See supra* section IV.B. As discussed above, substantial evidence supported the ALJ's credibility determination, as well as his determination that the medical evidence of record, on the whole, revealed only mild degenerative concerns (i.e., concerns that would appropriately limit plaintiff to a modified light RFC). Furthermore, it should be noted that the ALJ explicitly accounted for any drowsiness with an RFC that required plaintiff to work in a job that was "simple and routine in nature."

With respect to the DOT not addressing a sit/stand option, the court presumes that plaintiff, in reliance on SSR 00-4P, is arguing that the ALJ failed to resolve a conflict between the VE's testimony and the DOT. *See* SSR 00-4P at \*2 ("Occupational evidence provided by a [VE] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [VE] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled."). Contrary to this argument, the VE's testimony and the DOT are not in conflict; the DOT simply does not address sit/stand options. *Faulkner v. Astrue*, 2007 WL 2936111, at \*14 (D. Del Oct. 9, 2007). As a vocational expert, Ms. Reed was qualified, based upon her education,

20

training and experience, to opine about the employment market and plaintiff's ability to work within it.[10]  *Id.*  This is exactly what she did.  Moreover, "SSR 00-4P does not limit a VE's testimony solely to the DOT."  *Id.*  Thus, the explanation provided by the VE regarding the availability of a sit/stand option is reasonable and the ALJ did not err by relying it.  *Id.*

## V. CONCLUSION

For the reasons discussed above, the court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.  An appropriate order shall issue.

---

[10]  Her qualifications were not challenged.  (D.I. 7 at 57)